**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHAILE STEINBERG, Individually and On Behalf of All Others Similarly Situated, ) ) ) Plaintiff, ) ) v. ) ) MULTI PACKAGING SOLUTIONS ) INTERNATIONAL LIMITED, MARC ) SHORE, ZEINA BAIN, GEORGE BAYLY, ) RICHARD H. COPANS, ERIC KUMP, ) GARY MCGANN, THOMAS S. ) SOULELES, JASON TYLER, WESTROCK ) COMPANY, and WRK MERGER SUB ) LIMITED, ) ) Defendants. ) | Case No. _____ JURY TRIAL DEMANDED CLASS ACTION |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by her undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on January 24, 2017 (the "Proposed Transaction"), pursuant to which Multi Packaging Solutions International Limited ("Multi Packaging" or the "Company") will be acquired by WestRock Company ("Parent") and WRK Merger Sub Limited ("Merger Sub," and together with Parent, "WestRock").

2. On January 23, 2017, Multi Packaging's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, shareholders of

Multi Packaging will receive $18.00 per share in cash.

3. On February 17, 2017, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Multi Packaging common stock.

9. Defendant Multi Packaging is a Bermuda company and maintains its North American headquarters at 150 East 52nd Street, 28th Floor, New York, New York 10022. Multi

2

Packaging's common stock is traded on the NYSE under the ticker symbol "MPSX."

10.     Defendant Marc Shore ("Shore") has served as a director of Multi Packaging since March 2005 and is Chairman of the Board and Chief Executive Officer ("CEO"). According to the Company's website, Shore is a member of the Nominating and Governance Committee.

11.     Defendant Zeina Bain ("Bain") is a director of Multi Packaging.

12.     Defendant George Bayly ("Bayly") is a director of Multi Packaging. According to the Company's website, Bayly is a member of the Audit Committee and the Compensation Committee.

13.     Defendant Richard H. Copans ("Copans") is a director of Multi Packaging. According to the Company's website, Copans is Chair of the Nominating and Governance Committee.

14.     Defendant Eric Kump ("Kump") has served as a director of Multi Packaging since June 2015. According to the Company's website, Kump is Chair of the Compensation Committee.

15.     Defendant Gary McGann ("McGann") is a director of Multi Packaging. According to the Company's website, McGann is Chair of the Audit Committee and a member of the Nominating and Governance Committee.

16.     Defendant Thomas S. Souleles ("Souleles") has served as a director of Multi Packaging since June 2015. According to the Company's website, Souleles is a member of the Compensation Committee.

17.     Defendant Jason Tyler ("Tyler") is a director of Multi Packaging. According to the Company's website, Tyler is a member of the Audit Committee.

3

18. The defendants identified in paragraphs 10 through 17 are collectively referred to herein as the "Individual Defendants."

19. Defendant Parent is Delaware corporation and a party to the Merger Agreement.

20. Defendant Merger Sub is a Bermuda exempted company, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

21. Plaintiff brings this action as a class action on behalf of herself and the other public stockholders of Multi Packaging (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

22. This action is properly maintainable as a class action.

23. The Class is so numerous that joinder of all members is impracticable. As of January 20, 2017, there were approximately 77,695,438 shares of Multi Packaging common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

24. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

25. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and

adequately protect the interests of the Class.

26. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

27. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

28. Multi Packaging is a global leader in print and packaging with manufacturing operations in North America, Europe, and Asia.

29. The Company provides customers with an array of print-based specialty packaging solutions, including premium folding cartons, inserts, labels, and rigid packaging across a variety of substrates and finishes, which are complemented by value-added services, including creative design, new product development, and customized supply chain solutions.

30. Multi Packaging employs approximately 8,800 people worldwide and is strategically located to serve customers around the globe. Its global manufacturing footprint consists of fifty-nine manufacturing sites and nine sales offices across North America, Europe, and Asia.

31.     Since 2005, the Company has evolved from an initial U.S. platform of five facilities into a global specialty packaging leader in the consumer, healthcare, and multi-media end markets through completing a total of fourteen transactions. The Company's acquisitions have focused on expanding in its core end markets, adding complementary products and locations. In 2014, the Company entered into a transformational merger with Chesapeake Finance 2 Limited ("Chesapeake"), acquired the North American and Asian print businesses of AGI-Shorewood Group ("ASG"), and completed four additional acquisitions, which further expanded the Company's global footprint and significantly diversified its product and end market profile.

32.     On August 22, 2016, Multi Packaging issued a press release wherein it reported its results for the fourth quarter and fiscal year 2016. For fiscal year 2016, the Company reported that GAAP sales were $1.66 billion versus $1.62 billion in fiscal year 2015. GAAP operating income was $84.1 million versus $71.0 million in fiscal year 2015. Non GAAP net income was $48.0 million versus $21.7 million in fiscal year 2015. Additionally, adjusted EBITDA was $254.3 million versus $231.0 million in fiscal year 2015.

33.     With respect to the results, Individual Defendant Shore, CEO of the Company, commented:

> We had a very successful 2016, notwithstanding some significant challenges. EBITDA was a record $254.3 million despite a negative foreign exchange impact of $12.4 million. EBITDA margin grew by 100 basis points over the prior year to 15.3%. The business also generated approximately $109 million of free cash flow which allowed us to make early debt repayments of $60 million. . . .
>
> As we enter fiscal 2017, we are enthusiastic about our prospects. Our facility improvement plan is gaining traction and other measures that we have taken to enhance profitability are also being implemented. The company also remains committed to sourcing strategic and accretive acquisitions and there are several opportunities in the pipeline.

34. Nevertheless, on January 23, 2017, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

35. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.02(a) of the Merger Agreement states:

> (a) No Solicitation. Except as expressly permitted by this Section 5.02, from the date of this Agreement until the earlier of the Effective Time or the termination of this Agreement in accordance with its terms, the Company shall not, and shall cause its Subsidiaries not to, and shall use its reasonable best efforts to cause its and its Affiliates' directors, officers, employees, accountants, consultants, legal counsel, financial advisors and agents and other representatives (collectively, "Representatives") not to, (i) directly or indirectly solicit, seek, initiate, knowingly encourage or knowingly facilitate any inquiries regarding, or the making of, any submission or announcement of a proposal or offer that constitutes, or would reasonably be expected to lead to, any Acquisition Proposal, (ii) directly or indirectly engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other Person any information in connection with or for the purpose of encouraging or facilitating, any a proposal or offer that constitutes, or would reasonably be expected to lead to, any Acquisition Proposal, (iii) approve, endorse or recommend any Acquisition Proposal, or (iv) enter into any Alternative Acquisition Agreement. The Company shall, and shall cause its Subsidiaries to, and shall use its reasonable best efforts to cause its and their respective Representatives to, (A) immediately cease and cause to be terminated all discussions and negotiations with any Person or its Representatives that may be ongoing with respect to any proposal or offer that constitutes, or would reasonably be expected to lead to, any Acquisition Proposal, (B) immediately request the prompt return or destruction of all confidential information previously furnished any such Person or its Representatives and (C) immediately terminate all physical and electronic data room access previously granted to such Person or its Representatives.

36.     Further, the Company must promptly advise WestRock of any proposals or inquiries received from other parties.  Section 5.02(c) of the Merger Agreement states:

> (c) Notice of Acquisition Proposals. The Company shall promptly (and in no event later than 24 hours after receipt) notify Parent in writing after receipt by the Company or any of its Representatives of any proposal or offer that constitutes, or would reasonably be expected to lead to, any Acquisition Proposal, including of the identity of the Person making such proposal or offer and the material terms and conditions thereof (including any subsequent changes thereto), and shall promptly (and in no event later than 24 hours after receipt) provide copies to Parent of any written proposals, indications of interest and/or draft agreements and material related documentation relating to such proposal or offer that constitutes, or would reasonably be expected to lead to, any Acquisition Proposal. The Company shall keep Parent reasonably informed, on a prompt basis, as to the status of (including changes to any material terms or conditions of, and any other material developments with respect to) such proposal or offer that constitutes, or would reasonably be expected to lead to, any Acquisition Proposal (including by promptly (and in no event later than 24 hours after receipt) providing to Parent copies of any additional or revised proposals, indications of interest and/or draft agreements and material related documentation relating to such Acquisition Proposal). The Company agrees that it and its Subsidiaries will not enter into any agreement with any Person subsequent to the date of this Agreement which prohibits the Company from providing any information to Parent in accordance with this Section 5.02.

37.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants WestRock a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 5.02(d) of the Merger Agreement provides:

> (d) Adverse Recommendation Change. Except as set forth in this Section 5.02(d), the Company Board shall not (i) (A) change, withhold, withdraw, qualify or modify, in a manner adverse to Parent (or publicly propose or resolve to change, withhold, withdraw, qualify or modify), the Company Recommendation, (B) fail to include the Company Recommendation in the Proxy Statement, (C) approve, declare advisable or recommend, or publicly propose to approve, declare advisable or recommend to the shareholders of the Company, an Acquisition Proposal or (D) if a tender offer or exchange offer for shares of the Company that constitutes an Acquisition Proposal is commenced, fail to recommend against acceptance of such tender offer or exchange offer by the shareholders of the Company (including, for these purposes, by disclosing that it is taking no position with respect to the acceptance of such tender offer or exchange offer by its

8

shareholders, which shall constitute a failure to recommend against acceptance of such tender offer or exchange offer, within ten (10) Business Days after commencement of such tender offer or exchange offer (any of the foregoing, an "Adverse Recommendation Change") or (ii) authorize, adopt or approve or propose to authorize, adopt or approve, an Acquisition Proposal, or cause or permit the Company or its Subsidiaries to enter into any Alternative Acquisition Agreement. Notwithstanding anything herein to the contrary, at any time prior to the Company Shareholders Meeting, the Company Board may (I) effect an Adverse Recommendation Change if the Company Board has determined in good faith, after consultation with outside legal counsel, that the failure to take such action could reasonably be expected to be inconsistent with the directors' fiduciary duties under Applicable Law, or (II) if the Company receives an Acquisition Proposal that did not result from a material breach of Section 5.02(a) (or any material violation of the restrictions set forth in Section 5.02(a) by any Representative of the Company acting in its capacity as such) that the Company Board determines in good faith, after consultation with a financial advisor of nationally recognized reputation and outside legal counsel, constitutes a Superior Proposal, authorize, adopt, or approve such Superior Proposal and cause or permit the Company to enter into an Alternative Acquisition Agreement with respect to such Superior Proposal; provided, however, that the Company Board may only take the actions described in (x) clause (II) if the Company terminates this Agreement pursuant to Section 8.01(d) concurrently with entering into such Alternative Acquisition Agreement and pays the applicable Termination Fee in compliance with Section 8.03(b) and (y) clause (I) or (II) if:

(i) the Company has provided prior written notice to Parent of its or the Company Board's intention to take such actions at least three (3) Business Days in advance of taking such action, which notice shall specify (x) in the case of a Superior Proposal, the material terms of the Superior Proposal and shall include a copy of the relevant proposed transaction agreements with, and the identity of, the Person making the Acquisition Proposal, or (y) in cases not involving a Superior Proposal, the material circumstances giving rise to the Adverse Recommendation Change (and the Company shall keep Parent reasonably informed of any material developments with respect thereto);

(ii) after providing such notice and prior to taking such actions, the Company shall have, and shall have caused its Representatives to, negotiate with Parent in good faith (to the extent Parent desires to negotiate) during such three (3) Business Day period to make such adjustments in the terms and conditions of this Agreement as would permit the Company or the Company Board not to take such actions; and

(iii) the Company Board shall have considered in good faith any changes to this Agreement or other arrangements that may be offered in writing by Parent by 5:00 PM Eastern Time on the third (3rd) Business Day of such three (3) Business Day period and shall have determined in good faith (A) with respect to the actions

described in clause (I), after consultation with outside legal counsel, that it would continue to be inconsistent with the directors' fiduciary duties under Applicable Law not to effect the Adverse Recommendation Change and (B) with respect to the actions described in clause (II), after consultation with a financial advisor of nationally recognized reputation and outside legal counsel, that the Acquisition Proposal received by the Company would continue to constitute a Superior Proposal, in each case, if such changes offered in writing by Parent were given effect (it being understood and agreed that any amendment to any material term of such Superior Proposal shall require a new notice in accordance with Section 5.02(d)(i) and a new two (2) Business Day period).

38. Further locking up control of the Company in favor of WestRock, the Merger Agreement provides for a "termination fee" of $42.4 million, payable by the Company to WestRock if the Individual Defendants cause the Company to terminate the Merger Agreement.

39. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

40. Additionally, the Company's two largest stockholders – affiliates of The Carlyle Group and Madison Dearborn Partners, LLC – have entered into voting agreements, pursuant to which they have agreed to vote their Company shares in favor of the Proposed Transaction. Accordingly, over 57% of the Company's shares are already locked up in favor of the merger.

41. The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

42. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

43. Further, the merger consideration fails to adequately compensate the Company's stockholders for the significant synergies resulting from the merger.

44. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable

10

business, and future growth in profits and earnings.

45. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

46. For example, Individual Defendant Shore and Dennis Kaltman ("Kaltman"), President of the Company, have entered into employment agreements with WestRock, pursuant to which they will retain their employment positions following the close of the Proposed Transaction.

47. Additionally, Individual Defendant Shore stands to receive $5,960,485 in connection with the Proposed Transaction; Kaltman stands to receive $2,838,662; and the Company's three other named executive officers stand to receive $2,442,222.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

48. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

49. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

50. The Proxy Statement omits material information regarding Multi Packaging's financial projections and the financial analyses performed by the Company's financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"), in support of its so-called fairness opinion.

51. For example, with respect to Multi Packaging's financial projections, the Proxy Statement fails to disclose: (i) the Company's unlevered free cash flows as used by BofA Merrill Lynch in its *Discounted Cash Flow Analysis*; (ii) the corresponding definition of unlevered free cash flow as used by BofA Merrill Lynch in its *Discounted Cash Flow Analysis*; (iii) the

11

forecasted individual line items used in the calculation of unlevered free cash flow as used by BofA Merrill Lynch in its *Discounted Cash Flow Analysis*, including but not limited to cash taxes, changes in net working capital, and stock-based compensation expense; and (iv) a reconciliation of all non-GAAP to GAAP metrics.

52. With respect to BofA Merrill Lynch's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the projected stream of net operating losses that Multi Packaging was forecasted to utilize during fiscal year 2017 through 2032, and the resulting present value, as calculated and used by BofA Merrill Lynch; (ii) the inputs and assumptions underlying the calculation of the discount rate range of 8.2% to 9.8% used by BofA Merrill Lynch; (iii) the terminal year estimated unlevered, after-tax free cash flow amount to which the perpetuity growth rate range was applied; and (iv) the resulting calculated ranges of terminal values from using both perpetuity growth rates and terminal forward EBITDA multiples.

53. With respect to BofA Merrill Lynch's *Selected Publicly Traded Companies Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by BofA Merrill Lynch in its analysis.

54. With respect to BofA Merrill Lynch's *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the transactions observed by BofA Merrill Lynch in its analysis.

55. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to

better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

56. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the MPS Board of Directors and Reasons for the Merger"; (iii) "Opinion of BofA Merrill Lynch"; and (iv) "Certain Financial Forecasts."

57. The Proxy Statement also omits material information regarding potential conflicts of interest of BofA Merrill Lynch.

58. Specifically, the Proxy Statement fails to disclose the actual amount of the fee BofA Merrill Lynch will receive for the services it rendered in connection with the Proposed Transaction.

59. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

60. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the MPS Board of Directors and Reasons for the Merger"; and (iii) "Opinion of BofA Merrill Lynch."

61. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Multi Packaging's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Multi Packaging**

62. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

63. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Multi Packaging is liable as the issuer of these statements.

64. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

65. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

66. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

67. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

68. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

69. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and WestRock

70. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

71. The Individual Defendants and WestRock acted as controlling persons of Multi Packaging within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Multi Packaging and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

72. Each of the Individual Defendants and WestRock was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

73. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

74. WestRock also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

75. By virtue of the foregoing, the Individual Defendants and WestRock violated Section 20(a) of the 1934 Act.

76. As set forth above, the Individual Defendants and WestRock had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: February 28, 2017             **RIGRODSKY & LONG, P.A.**

By: */s/ Timothy J. MacFall*
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516

Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

*Attorneys for Plaintiff*